# DISTRICT OF COLUMBIA v. McBLAIR.

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Submitted January 5, 1888. — Decided January 23, 1888.

Under the act of August 18, 1856, 11 Stat. 118, c. 163, the *cestuis que trust* under a will devising real estate in the District of Columbia to trustees, with limitation over, filed a bill in equity in the Supreme Court of the District praying for a sale of a portion of the lands held in trust, in order that the sums received from the sale might be applied to the improvement of the remainder. Such proceedings were had therein that a trustee was appointed by the court to make the sale as prayed for, and a sale was made by him to J. M., husband of one of the *cestuis que trust*, for the sum of $24,521.50. He gave his promissory notes to the trustee so appointed for this sum, and the sale was ratified and confirmed by the court. J. M. then sold the tract thus sold to him, to the District of Columbia as a site for a market, and received in payment thereof market bonds of

the District, of the nominal value of $27,350, from which he realized $22,700. Instead of paying the sum derived from the sale of these bonds to the trustee in part payment of his note, and to be applied to the improvement of the remainder as prayed for in the bill, J. M. applied it directly to such improvement. The District of Columbia then filed its petition in the cause, setting forth the facts, and praying that, as the proceeds of the bonds had in fact been applied, although irregularly, to the improvement as contemplated, an account might be taken of the amount so expended, and J. M.'s notes be cancelled as paid, and the trustee ordered to convey directly to the District. *Held*, that the District had an equity which entitled it to have the $22,700 credited on J. M.'s notes in the hands of the trustee, and a further equity on payment to the trustee of the balance of the agreed price, to have those notes cancelled, and to have a conveyance of title from the trustee, discharged of all lien on account of unpaid purchase money, and that no resale would be ordered until there should be a default by the District in making the additional payment within some reasonable time to be fixed by the court.

BILL IN EQUITY. The case, as stated by the court, was as follows:

An act of Congress to authorize the Circuit Court of the District of Columbia to decree the sale of real estate in certain cases, approved August 18, 1856, 11 Stat. 118, c. 163, provides: "That in all cases in which real estate within the District of Columbia shall have been limited heretofore, or shall be limited hereafter, by the provisions of any deed or will, to one or more, for life or lives, with a contingent limitation over to such issue of one or more of the tenants for life as shall be living at the death of their parent or parents, and the said deed or will containing the limitation shall not prohibit a sale, the Circuit Court for the District of Columbia, upon the application of the tenants for life, shall have power to decree a sale of such real estate, if, upon the proofs, it shall be of opinion that it is expedient to do so, and to decree to the purchaser an absolute and complete title in fee simple."

Section 2 enacts: "That application for the sale of such real estate shall be by bill in equity, verified by the oath or oaths of the party or parties, in which all the facts shall be distinctly set forth, upon the existence of which it is claimed to be expedient that such sale should be decreed; which facts shall be proved by competent testimony. Such of the issue

contemplated by the limitation as shall be in existence at the time of the application for the sale of such real estate shall be made parties defendant to the bill, and, if minors, by guardian *ad litem*, together with all who would take the estate in case the limitation over should never vest. Such of the parties defendant as shall be of the age of fourteen years or more shall answer in proper person, on oath, and all evidence shall be taken upon notice to the parties and to the guardian *ad litem.*"

Section 3 requires: "That the proceeds of the sale of such real estate shall be held under the control and subject to the order of the court, and shall be vested under its order and supervision, upon real and personal security, or in government securities; and the same shall, to all intents and purposes, be deemed real estate, and stand in the place of the real estate from the sale of which such proceeds have arisen, and, as such real estate, be subject to the limitations of the deed or will.".

To obtain the benefit of this act, on July 30, 1868, Augusta McBlair, wife of J. H. McBlair, and Julia Ten Eyck, wife of John C. Ten Eyck, filed a bill in equity in the Supreme Court of the District of Columbia, in which it was alleged that John Gadsby, the father of the complainants, died in the District of Columbia in the year 1844, leaving a last will and testament whereby he devised to trustees, and the survivors of them, certain real estate in the city of Washington, known as lots Nos. 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19, in square No. 78, in trust, after the expiration of twelve months from his death, to permit his daughters to receive the rents, issues, and profits thereof, for their sole and separate use and enjoyment, in equal moieties for life, respectively, so that neither said property nor the income thereof should be subject to the control or disposition of the respective husbands of his said daughters, or responsible for their debts; and in case either of his said daughters should die leaving no issue living at her death, that the interest or estate of her so dying without issue should become forthwith vested in the survivor, in the same manner as her own moiety was before held and enjoyed; and in case both or either of said daughters should

die leaving issue living at the time of her death, then the said trustees should hold the property to the use of said issue, one moiety to the issue of each of his said daughters; and in case one only of them should die leaving such issue, then, after the death of the other daughter, the whole of said estate should vest in said issue in fee simple.   The contingency of the death of both of his said daughters without issue was not provided for in the will, thereby leaving a contingent reversion in his right heirs.   It was also alleged in the bill that the complainant Augusta McBlair had children, viz.: John G. McBlair, Virginia Smith, wife of —— Smith, J. H. McBlair, Jr., Julia I. McBlair, C. Ridgeley McBlair, and S. Jackson McBlair, of whom said last two were. minors under twenty-one years of age; and that said complainant Julia Ten Eyck also had children, viz.: Augusta Ten Eyck, Julia Ten Eyck, Jane Ten Eyck, May Ten Eyck, and John C. Ten Eyck, of whom the last three were minors under twenty-one years of age; that besides the complainants John Gadsby left as his heirs at law his son William Gadsby, and his other daughters, Ann Sophia Newton and Margaret S. Chapman, and of these Ann Sophia Newton had died before the filing of the bill, leaving as her heirs at law Albert Newton, Maria McCommick, and Margaret Wallach, wife of W. Douglas Wallach; and that William Gadsby had died leaving as his heirs at law William Gadsby, Sallie Gadsby, Eakin Gadsby, and Mary Gadsby, the last of whom was a minor under twenty-one years of age.   It was also alleged that of the trustees named in the will the survivor, Alexander McIntyre, had also died before the filing of the bill, leaving heirs at law, who are therein named as defendants.

It was also alleged in the bill, that of the lots of ground enumerated those numbered 8, 9, and 10 front upon north 1 Street, in the city of Washington, and are improved by a substantial row of dwellings, six in number, and all the others are vacant and unimproved, except where partially occupied by outbuildings; that said dwelling-houses are of considerable value, and if properly improved and modernized, would yield a good income and revenue, which would enure to the benefit

of all parties interested, but that at present they are much out of repair, old fashioned, and unprovided with modern conveniences; that the vacant lots in the rear, front upon K Street north, and at present yield no income, but would sell, and it would be greatly to the advantage of all parties to make sale of said lots and apply the proceeds to the improvement of said dwelling-houses; that the complainants have not the means to make such improvements, the income now accruing to them from their father's estate being wholly inadequate to their support; that as an additional reason for such sale it is alleged that said vacant lots are burdensome to the complainants by reason of the heavy municipal taxes to which they are subject, so that their retention defeats the primary object of said testator, which was not to burden the complainants as devisees, but to provide them an ample revenue for their comfortable support.

The prayer of the bill is, that the parties named therein be made defendants, and that, pursuant to the act of Congress of August 18, 1856, a decree be granted for a sale of said vacant lots for the object aforesaid, and for general relief.

On this bill such proceedings were thereafter had that a decree *pro confesso* was entered against the non-resident defendants, served by publication, and the resident defendants, served with process, who had made default, and the cause was set for hearing as against such defendants as had answered; and thereupon it was ordered that the cause be referred to a special auditor "to inquire and report whether it will be expedient, and for the benefit of all parties interested, that the property described in the proceedings be sold, and that the prayer of the bill as to the application of the proceeds should be granted."

On May 8, 1869, the auditor filed his report in writing that the disposition of the property in the manner sought by the bill would be for the interest and advantage of all parties concerned, and recommending that the prayer of the bill be granted. On May 10, 1869, a decree was entered directing a sale of the property by Walter S. Cox, as trustee appointed for that purpose, who was directed thereby "to make sale of

said property at public auction or at private sale, as he may find expedient, and if at public auction, after giving at least three weeks' previous notice by advertisement in some convenient newspaper of the time, place, and terms of sale, which terms shall be, one-third of the purchase money to be paid in cash, and the residue in two equal instalments at six and twelve months after date, with interest, to be secured by approved notes and a lien reserved, and on the ratification of such sale and full payment of the purchase money he shall convey the property sold to the purchaser, with all the title of the parties to this cause, and, as soon as convenient after any such sale, he shall make report of the same and of the fairness thereof to this court, under oath, and shall bring into court the proceeds of sale to abide the court's future order in the premises."

On June 13, 1872, Walter S. Cox, the trustee, reported that he had made sale "of the lots of ground described in the bill, being lots 14, 15, 16, 17, 18, 19, 20, and 21, and the north twenty-three feet five inches of lot 13, in square No. 78, to J. H. McBlair, for the sum of twenty-four thousand five hundred and twenty-one $\frac{50}{100}$ dollars; for which sum the said McBlair has passed to the undersigned his two promissory notes, each for twelve thousand two hundred and sixty $\frac{75}{100}$ dollars, payable, respectively, in three and six months after date, with interest." A rule to show cause why this sale should not be confirmed having been entered on June 13, 1872, and no cause having been shown, the court, on July 16, 1872, entered a decree ratifying and confirming the sale.

On June 15, 1874, the District of Columbia, then being a corporate body for municipal purposes by virtue of the act of Congress of February 21, 1871, filed its petition in the cause, wherein, after reciting the proceedings therein, including the sale of the said premises to McBlair, it alleged that by virtue of an act of the legislative assembly of the District of Columbia, approved August 23, 1871, entitled "An act to provide for the purchase of certain market sites and the erection thereon of certain markets," Henry D. Cooke, then Governor of the District of Columbia, on July 26, 1872, had purchased the said lots numbered 14, 15, 16, 17, 18, 19, 20, and 21, and

part of lot 13, in square No. 78, from said McBlair, who, together with his wife, Augusta McBlair, one of the complainants, had executed and delivered a deed in fee simple conveying the said premises to the District of Columbia, with covenants of general warranty, for the consideration, as expressed in said deed, of $26,521.50, which consideration, the petition alleged, was paid in certain market-stock bonds of the District of Columbia computed at ninety-seven cents on the dollar, and said bonds to the amount of $27,350 were delivered to said McBlair in satisfaction thereof.

It was further alleged in the petition that "the said McBlair made a sale of said premises to the petitioner, and forthwith and long before receiving payment therefor entered into a contract for the repair of certain buildings in which the parties to said cause are interested, to be paid for out of the proceeds of said sale, and, upon receiving payment for said property from the petitioners, as hereinbefore stated, proceeded to expend the money upon said buildings. Said contract and payment having been made and said deed executed by McBlair to the petitioner without the knowledge or concurrence of said trustee, regularly said McBlair ought to have paid the amount of his notes to said trustee in order that the money should be disbursed under directions of the court, without which payment his title to said property did not become technically complete, and said trustee could not convey to him. But the petitioner shows that the object of the bill in this cause was to have the proceeds of said property applied precisely as they were applied, to wit, to the improvement of the buildings aforesaid so as to increase the rental value thereof; and if the proceeds of said ground, to the amount of said McBlair's notes to said Cox, trustee, were, in fact, applied to said object, as petitioner avers was the case, then, however irregular such proceeding, the said notes are virtually paid, and said trustee ought to execute a deed for said premises to the petitioner as assignee of said McBlair."

The petition therefore prayed that an account might be taken of the expenditures from the proceeds of the bonds upon said buildings; that said notes of McBlair to the trustee

be cancelled as paid, and said trustee be directed to convey the premises to the District of Columbia, and for general relief.

On the filing of this petition, the matter thereof was referred to the auditor to state an account in respect to the expenditures from the proceeds of the bonds in the petition mentioned; and by consent of counsel, on April 22, 1875, this order of reference was enlarged so as to require the auditor also to report his conclusions in respect to the subject matter of the petition on the evidence heretofore taken under the pending reference of the cause. On July 26, 1875, the auditor filed his report, in which he finds that the purchase price agreed upon for the lots mentioned to be paid by the District of Columbia was $26,521.50 cash, payable in the market-stock bonds of the District of Columbia, of the nominal value of $27,350, guaranteed to produce ninety-seven cents on the dollar; that in point of fact those bonds had realized not more than $22,700, and that the purchase money of the property, therefore, had not been paid by the amount of the difference between that sum and the agreed price, equal to $3821.50. The report, therefore, recommended that the prayer of the petition for a decree directing the trustee to convey the premises to the petitioner should be denied. Exceptions were filed on behalf of the District of Columbia to this report, and on August 7, 1875, they were sustained by the court, and the prayer of the petition of the District of Columbia was granted, and the trustee, Walter S. Cox, was directed to execute and deliver a conveyance of the premises in said petition mentioned to the District of Columbia, and to surrender the notes of J. H. McBlair in said petition mentioned to said McBlair as though they had been paid. From this decree of the court at special term an appeal was taken by J. H. McBlair to the general term, and on March 4, 1876, the decree of the special term of August 7, 1875, was reversed, and the cause remanded to the special term to be further proceeded with as the parties might be advised.

The record further shows that on July 14, 1876, Williams and Gallant filed a petition in the cause, setting up a lien as

builders under a contract made with McBlair for work done in erecting back buildings and remodelling main buildings on lots Nos. 8, 9, and 10 in square No. 78, mentioned in the original petition, whereby they were to receive therefor the sum of $18,000, with additional compensation for extra work. The petitioners admit they had received from McBlair on account thereof the sum of $17,205, and claimed a balance due of $2299.20, with interest from April 30, 1873. It is alleged in the petition that the parties in the cause had knowledge that the petitioners were doing work on the dwelling-houses under the contract with McBlair, and that the amount due on account thereof was to be paid for out of the proceeds of the sale of the vacant lots. It was also alleged that John C. Harkness had been appointed trustee under the will of Gadsby; and the prayer of the petition was, that he should be directed to pay to the petitioners the amount of the balance due them out of the trust estate in his hands. Harkness, as trustee under the will, answered this petition, denying its equity. The matter was referred to the auditor of the court, who reported a balance due the petitioners of $2050.70, with interest from April 30, 1873. On this report, on December 13, 1877, a decree of the court at special term was made confirming the auditor's conclusion finding the balance due to the petitioners, which was declared to be a lien on the proceeds of the sale of the vacant lots mentioned and described in the cause and sold by Walter S. Cox, as trustee; and thereupon the said Walter S. Cox, as trustee, was directed and ordered to proceed to collect from the purchaser of said vacant lots the purchase money and interest due thereon, and pay the amount found due to the petitioners; "and, further, if said purchase money and interest be not paid to him, said Walter S. Cox, as trustee, be, and he is hereby, instructed to proceed to advertise and sell said vacant lots, under the same terms and conditions in the original decree of sale prescribed, at the cost and risk of said purchaser or purchasers." On February 20, 1880, Walter S. Cox resigned his office as said trustee, and the court appointed William J. Miller as trustee in his stead, who was required to proceed to perform the duties required of

the former trustee. William J. Miller, the new trustee, on February 27, 1880, receipted to Cox, his predecessor, for the two promissory notes of McBlair given for the purchase money of the property sold to him; and on June 1, 1880, the court at special term "ordered, adjudged, and decreed that said trustee proceed to readvertise and sell the real estate heretofore sold to John H. McBlair, at the cost and risk of said John H. McBlair, the defaulting purchaser." From this decree of June 1, 1880, an appeal was taken in behalf of the defendants John G. McBlair, Virginia Smith, J. H. McBlair, Julia I. McBlair, Charles Ridgeley McBlair, A. Jackson McBlair, Augusta Ten Eyck, Julia Ten Eyck, Jane Ten Eyck, Mary Ten Eyck, May Ten Eyck, John C. Ten Eyck, and John C. Harkness, trustee, which, however, does not appear by the record to have been prosecuted. On July 1, 1880, a separate appeal was taken from the same decree on behalf of the District of Columbia.

On December 27, 1880, it appears that another petition was filed by Williams and Gallant, setting up all the previous matters that had occurred in the course of the cause, and the failure on their part to obtain satisfaction of the amount due to them, and asking for a decree against John C. Harkness, as trustee of the estate of Gadsby, for payment of the same out of the funds in his hands as such. A decree to that effect was entered, from which Harkness appealed, and in the general term, on June 14, 1881, it was affirmed; and thereupon, the amount having been paid, it was ordered that satisfaction of the claim should be entered on July 16, 1881. On November 19, 1885, the appeal taken by the District of Columbia on July 1, 1880, from the decree of June 1, 1880, was placed on the calendar of the general term, and on February 1, 1887, that decree was affirmed, and it was ordered that "William J. Miller, the trustee appointed by the court for the purpose, be, and he hereby is, authorized and directed to readvertise and resell the real estate heretofore sold to John H. McBlair, at the risk and cost of the said John H. McBlair, the defaulting purchaser." From this decree the District of Columbia took the present appeal to this court.

*Mr. Henry E. Davis* for appellant.

*Mr. J. J. Darlington* for appellee.

Mr. Justice Matthews, after stating the case, delivered the opinion of the court.

An objection is taken by counsel for the appellees to the consideration of the merits of the present appeal, on the ground that the matter involved therein had been previously and finally adjudged against the District of Columbia by the decree of the general term of February 4, 1876, reversing the decree of the special term directing a conveyance of the title of the premises in controversy to the appellant. It is alleged that this decree was final against the District of Columbia upon the right claimed in its petition, from which no appeal having been taken, it has thereby become conclusive. The point, however, is not well taken. The decree in question reversed the decree of the special term of August 7, 1875, and remanded the cause to the special term to be further proceeded with as the parties might be advised. It did not direct a dismissal of the petition of the District of Columbia, and was, therefore, not a final adjudication upon its right to some relief in accordance with the prayer of the petition.

Proceeding to consider the appeal upon its merits, we find that it involves but a single question, to wit, whether, because the District of Columbia has not fully paid the consideration for the conveyance made by McBlair and wife of the title to the premises in controversy, it has lost all right to obtain from the trustee, by order of the court, a conveyance of the title. The auditor, to whom the matter had been referred, reported that the market-stock bonds delivered by the District of Columbia to McBlair as the consideration for his deed produced only $22,700. It seems to be assumed in this report and elsewhere throughout the case that the cash proceeds of these bonds were applied by McBlair to the repair and improvement of the buildings upon the remaining lots, to the benefit of the estate and the beneficiaries under the will, in the same manner and to the

same extent as if those proceeds had gone into the hands of the trustee and been directly applied by him according to the order of the court. This certainly constitutes an equity in favor of the appellant to the extent of these payments, entitling it to have them credited upon McBlair's notes in the hands of the trustee, in satisfaction of that much of the original amount due on account of the sale. The appellant also has a further equity, on payment to the trustee of the additional amount necessary to make good the whole amount of the agreed price of the property sold, to have the McBlair notes cancelled and a conveyance of the title by the trustee, discharged of all lien, on account of unpaid purchase money. This amount is the difference between $24,521.50, for which the property was sold to McBlair, and $22,700, the amount of cash actually received from the proceeds of the bonds, being $1821.50, with interest thereon from the time of the sale to McBlair. It is, indeed, contended on the part of the District of Columbia that the consideration agreed upon between it and McBlair has been fully satisfied by the delivery of the bonds, the guaranty that they should produce ninety-seven cents on the dollar being denied as a matter of fact. The auditor, however, has reported otherwise upon the fact, and the record does not furnish us with a means of testing the accuracy of his conclusion. We are of opinion, however, independently of that controversy, that the District of Columbia cannot avail itself of any agreement with McBlair to accept bonds instead of cash. Its obligation as the assignee of his bid is to pay his notes in full in money according to their tenor, and it is, therefore, bound to make good the difference between what McBlair actually received from it in money and the amount called for by his notes. Any resale of the property ordered by the court should be only in case of a default on the part of the appellant in making this additional payment within some reasonable time to be fixed by the court. The decree ordering a resale, without regard to the previous payments, and the right to make such additional payments as should be ascertained to be due and required to be paid, was therefore erroneous.

Counsel for the appellees contend in argument that the

application of the proceeds of the sale to repair and improve the buildings upon the unsold portions of the real estate, was not a legitimate investment of such proceeds within the purview of the third section of the act of Congress of August 18, 1856, which requires that the proceeds of such sale shall be held under the control and subject to the order of the court, and invested under its order and supervision upon real and personal security or in government securities. But that question was finally passed upon by the court below in the decree of May 10, 1869, directing the sale for the purpose prayed for. This decree, it is true, directs that the proceeds of the sale be brought into court to abide its future order, but the actual application of the proceeds of sale to the improvement of the other property was distinctly brought to the notice of the court by the petition of the District of Columbia, and was assumed as rightful throughout the whole history of the case, without objection from any of the parties in interest. It would be grossly inequitable to permit the appellees, at this stage of the cause, to insist upon the objection. The discretion to make such an investment of the proceeds of the sale is conferred upon the Supreme Court of the District of Columbia by the act of Congress authorizing the sale. The District of Columbia, as purchaser from McBlair, of course had full notice that the purchase money was unpaid, and was bound as purchaser to see to the application of its own payments; but as no question has been made upon the fact that the money paid by it has gone to benefit and improve the estate of the appellees in the manner and to the extent contemplated by the court in ordering the sale of the unimproved lots, the appellant has a right, upon payment of the additional amount due from McBlair on account of the sale, to have a conveyance, under the order of the court, by the trustee.

*The decree of the Supreme Court of the District of Columbia appealed from is, therefore, reversed, and the cause remanded, with directions to ascertain the amount still due from McBlair on his notes, given on account of his purchase, after crediting thereon the amount realized by him from the sale of the market-stock bonds; and, on payment*

*of the amount thereof by the appellant, to decree a convey-*
*ance of the title of the parties to this cause by the trustee to*
*the District of Columbia; and in default of such payment,*
*within a reasonable time to be fixed therefor, to direct a re-*
*sale of the said premises for the satisfaction thereof.*